UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

IN THE MATTER OF                                              Hon. Hugh B. Scott
THE EXTRADITION OF                                                 11-MR-50[1]
NOKOUR CHOUGUI ALI                                            Decision & Order

_____

Presently pending before this Court is the government's application for a determination that probable cause exists for the provisional arrest of Nokour Chougui Ali ("Ali") in connection with an anticipated extradition request by Canada.

Pursuant to 18 U.S.C. §3184, any judge or justice of the United States is authorized to hear cases arising under any extradition treaty or convention. Magistrate Judges may also determine extradition cases when authorized by the District Court. Austin v. Healey, 5 F.3d 598, 602 (2d Cir. 1993). In the instant case, Hon. Richard J. Arcara referred the instant matter to the undersigned for disposition. (Docket No. 1). Ali does not challenge the Court's jurisdiction to determine the instant application for provisional arrest. Similarly, Ali does not challenge the Court's jurisdiction over his person inasmuch as he is currently in federal custody within the geographic jurisdiction of this Court.[2]

---

[1] When this matter was commenced, it was assigned number 11-M-2057. All further proceedings in this matter will be filed under the Miscellaneous Criminal number 11-MR-50.

[2] Similarly, at the probable cause hearing on July 26, 2011, the defendant represented that he does not contest that he is the individual identified in the papers underlying the instant extradition request.

**Extradition Treaty between the United States and Canada**

The United States is proceeding under the Treaty on Extradition between the United States of America and Canada, signed at Washington, D.C. December 3, 1971, and entered into force on March 22, 1976 (TIAS 8237)(as amended) ["the Treaty"]. (Docket No. 2-1). Artilce 11 of the Treaty provides:

> (1) In case of urgency a Contracting Party may apply for the provisional arrest of the person sought pending the presentation of the request for extradition through the diplomatic channel. Such application shall contain a description of the person sought, an indication of intention to request the extradition of the person sought and a statement of the existence of a warrant of arrest or a judgment of conviction against that person, and such further information, if any, as would be necessary to justify the issue of a warrant of arrest had the offense been committed, or the person sought been convicted, in the territory of the requested State.
>
> (2) On receipt of such an application the requested State shall take the necessary steps to secure the arrest of the person claimed.
>
> (3) A person arrested shall be set at liberty upon the expiration of forty-five days from the date of his arrest pursuant to such application if a request for his extradition accompanied by the documents specified in Article 9 shall not have been received. This stipulation shall not prevent the institution of proceedings with a view to extraditing the person sought if the request is subsequently received.

Treaty signed at Washington December 3, 1971; T.I.A.S. No. 8237, Article 11.

The parties agree that, for the purposes of the provisional arrest, the government must demonstrate probable cause warranting the provisional arrest of Ali. The standard to be observed by the Court is whether probable cause, as defined under the laws of the United States, exists to believe that the sought after fugitive committed the offense for which extradition is requested. See Sindona v. Grant, 619 F.2d. 167 (2d. Cir. 1980) (interpreting similar burden under a treaty

between the United States and Italy).  See also Caltagirone v. Grant, 629 F.2d 739, 745-46 (2d Cir.1980); Restatement (Third) of the Foreign Relations Law of the United States § 476 comment b (1987) ("*Restatement 3d*"). A judicial officer need not "predict that [a foreign] court would convict [the relator]," Ahmad v. Wigen, 910 F.2d at 1066, it need only find evidence to "support a reasonable belief that [the relator] was guilty of the crime charged." Id.  As stated in Simmons v. Braun, 627 F.2d 635 (2d. Cir. 1980):

> The purpose of the hearing is simply to determine whether the evidence of the fugitive's criminal conduct is sufficient to justify his extradition under an appropriate treaty. The Federal Rules of Criminal Procedure are not applicable. See Rule 54(b) (5). Neither are the evidentiary rules of criminal litigation. United States v. Mulligan, 50 F.2d 687, 688 (2d Cir.), cert. denied, 284 U.S. 665 (1931). Hearsay evidence is admissible. Id. Unsworn statements of absent witnesses may be considered. Collins v. Loisel, 259 U.S. 309, 317, 42 S.Ct. 469, 472, 66 L.Ed. 956 (1922). There is no inherent right to the confrontation and cross-examination of witnesses. Bingham v. Bradley, 241 U.S. 511, 517, 36 S.Ct. 634, 637, 60 L.Ed. 1136 (1916). Moreover, the exclusionary rule is not applicable to all stages of even domestic law enforcement, see, e.g., United States v. Calandra, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) (grand jury proceedings), and is primarily justified where exclusion of illegally obtained evidence will serve to deter Fourth Amendment violations. See Stone v. Powell, 428 U.S. 465, 486, 96 S.Ct. 3037, 3048, 49 L.Ed.2d 1067 (1976).

Simmons, 627 F.2d. at 636-637. Moreover, while the defendant may present evidence that explains the government's proof and tends to negate a showing of probable cause, he may not provide evidence that "contradicts the demanding country's proof." In the Matter of the Extradition of Ben-Dak, 2008 WL 1307816, at *4 (S.D.N.Y. 2008).

     The Defendant was arrested on June 21, 2011, pursuant to a complaint for the provisional arrest of the defendant in contemplation of his extradition to Canada. The Complaint and Arrest

Warrant were signed by the Court on June 15, 2011. The defendant made his initial appearance on the Complaint on June 21, 2011. At his initial appearance, it was determined that the defendant was eligible for appointed counsel. Assistant Public Defender Kimberly A. Schechter accepted the assignment. A probable cause hearing was conducted on July 26, 2011.

The defendant, a citizen of Chad, does not have legal status in the United States and is the subject of an arrest Warrant in Canada for violent offenses committed in or about Sudbury, Ontario, which occurred on April 14, 2011. At the probable cause hearing, the government submitted documentary evidence in support of a finding that probable cause exists for the provisional arrest of Ali. A synopsis provided by Counsel for the International Assistance Group for the Minister of Justice of Canada (attached to the Government's Affidavit in Support of Provisional Arrest in Contemplation of Extradition, Docket No. 2 [filed under seal]), sets forth the allegations as giving rise to the charges against Ali. It is alleged that on April 14, 2011, in Sudbury, Ontario, Laura Stewert was picked up by her boyfriend, Adoum Djamal shortly after midnight. In the car with Djamal at that time were Ali (with whom Stewert was already acquainted) and Moussa Babalkher. Stewert stated that she got into the back right seat of the vehicle and that Ali was seated in the back left seat, while Djamal drove and Babalkher was in the front passenger seat. They proceeded to the Solid Gold Lounge in Sudbury. Stewert stated that she and Djamal waited in the vehicle as Ali and Babalkher went inside. Another individual, Joshua O'Neill, who was working as a doorman at the Solid Gold Lounge provided Canadian authorities with a statement that at approximately 12:45 a.m. he was notified by Julia Scovron (the bar manager) that a customer was causing problems with one of the female exotic dancers. O'Neill approached the customer (believed to be Babalkher), who was accompanied by another

individual (believed to be Ali). O'Neill stated that he explained the bar rules relating to conduct toward the dancers, and that Babalkher suddenly became irate and called O'Neill a racist. The incident quickly escalated and O'Neill stated he physically escorted Babalkher out of the building. In the process, O'Neill states that Babalkher slapped O'Neill across the face and intentionally broke the pane of glass on the front door. Once outside the bar, Babalkher allegedly took his belt, wrapped it around his hand and began to whip O'Neill, striking him in the upper body. Babalkher and Ali then ran towards the vehicle and got in. According to O'Neill, the vehicle then proceeded to race toward the front door where he was standing and stopped withing eight feet of him. O'Neill alleges that Babalkher got out of the vehicle and once again attacked him with the belt. O'Neill states that he grabbed Babalkher and held him down over the hood of the vehicle. According to O'Neill, at that time, Babalkher began yelling toward the vehicle: "Shoot! Shoot!". O'Neill then stated that he saw the rear window of the car go down and the door open slightly; he saw a handgun extend from out of the right rear window and heard one shot. O'Neill then realized that he had been shot in the chest. O'Neill fell back and attempted to hide behind another car, as he was doing so, he stated that he heard Babalkher yell "Go get him! Keep shooting him." O'Neill heard a second shot and realized that he was shot in the thigh.

As this was unfolding, Ken Whealy was pulling into the parking lot of the Solid Gold Lounge and witnessed the incident. Whealy stated that he saw two black males get out of the vehicle and that one of the males had his belt off and was holding it in his hand. A few seconds later, Whealy stated that he heard three "popping" sounds which he believed came from a small caliber firearm. The two black males got back into the vehicle, which quickly fled from the parking lot. Whealy stated that he followed the vehicle in his own car (while talking to the police

on his cell phone) until he lost sight of the vehicle on Mont Adam Street. He described the vehicle as a black or blue SUV with a Quebec license plate FWG 9590. According to another statement provided to the Canadian authorities, at about 1:15 a.m. on April 14, 2011, Cindy Habijanac was parked in her vehicle at 117 Mont Adam Street and observed a dark SUV pull into the spot next to hers. She stated that she witnessed two black males and a female (who purportedly "looked worried") get out of the vehicle. She stated that they all looked to be in a rush and "looked panicked." At this time, Sudbury police, who were on their way to Mont Adam Street, received information that a female had requested a taxi at 117 Mont Adam Street. Sudbury police arrived at 117 Mont Adam and observed a male who matched Whealy description of Babalkher walking towards a taxi in front of the building.  The individual, who was later identified to be Balalkher, was arrested at that time.

　　　　Later on April 14, 2011, Stewert, accompanied by her attorney, provided the police with a video statement regarding the event. She corroborated O'Neill's statement that after Babalkher and Ali ran back to the vehicle, Djamal (who was driving) "sped" towards the front door of the Solid Gold Lounge; that Ali and Babalkher got out of the car and were involved in an altercation with the bouncer; that she heard "popping" noises and crouched down behind the seat in such a way that she could not see what happened. She stated that when they got back into the vehicle, Babalkher got into the front passenger seat, and Ali was in the right side of the rear seat and that Djamal drove away at a very high rate of speed. Stewart stated that they ended up at 117 Mont Adam Street; that Ali ran away extremely fast and never came back. She stated that she "begged" Djamal and Babalkher to let her leave but they said she could not leave them. She stated that she called a taxi from her cell phone  She stated that she tried to leave but Babalkher "hugged her

-6-

from behind" (she noted that he still had his belt in his hand). Babalkher took her phone and threw it on the ground. Babalkher then walked toward the taxi, while Stewert and Djamal ran off in opposite directions. Stewert identified Ali as the other individual in the vehicle. Arrest warrants were issued for Ali and Djamal. Djamal turned himself into the police on April 25, 2011.

The outstanding Canadian charges against Ali include: 1. attempted murder with a firearm; 2. possession of a dangerous weapon; 3. discharge of a firearm with intent to endanger life; 4. careless use of a firearm; 5. unauthorized possession of a firearm; 6. knowledge of unauthorized firearm; 7. possession of a firearm while prohibited by prior order; 8. unlawful pointing of a firearm; 9. knowingly being in a vehicle which contained a restricted weapon; and 10. breach of probation. (See Request for Provisional Warrant from Greater Sudbury, Ontario, Canada attached to the Government's Affidavit in Support of Provisional Arrest in Contemplation of Extradition ["Request for Provisional Warrant"], Docket No. 2 [filed under seal]). The documentary evidence also includes a finger print card from Ali's arrest on September 24, 2010 with respect to unrelated charges (Request for Provisional Warrant, Exhibit A); an Order stating that Ali was prohibited from possessing a weapon due to his conviction on prior firearms charges (Request for Provisional Warrant, Exhibit B); Probation Orders relating to Ali's probation dated in September of 2010 (Request for Provisional Warrant, Exhibits C and D); a document charging Ali (and others) of the crimes alleged to have occurred on April 14, 2011 (Request for Provisional Warrant, Exhibit E); a warrant for the arrest of Ali issued by the Canadian authorities (Request for Provisional Warrant, Exhibit F); a ballistics report regarding the bullets and cartridges recovered on April 14, 2011 (Request for Provisional Warrant, Exhibit

G) and copies of the relevant Canadian statutes with respect to the charges filed against Ali (Request for Provisional Warrant, Exhibit H).

Ali was arrested on May 11, 2011 in Burke, New York for illegal entry into the United States. When approached by Border Patrol officers at that time, Ali allegedly became irritated and reluctant to answer basic questions regarding his identity and citizenship.  He admitted that he was a citizen of Chad, but was not in possession of any immigration documents or identification. He told the officers his name was Rozi Abakar. The officers observed that Ali's pants and sneakers were wet and covered with mud, and that he had several scratches on his arm for which he had no reasonable explanation. Ali was detained for further questioning, and subsequent fingerprint analysis revealed his true identity and that he was wanted by Canada as a suspect in an attempted murder.  (Government Hearing Exhibit A, Record of Deportable/Inadmissible Alien at pages 3-4).  On May 26, 2011, Ali pled guilty to illegal entry into the United States.  See Judgement of Conviction dated May 26, 2011 (Government's Hearing Exhibit 2).

Based upon the above, the Court finds that the sworn complaint, supported by the documentary evidence discussed above, is sufficient to establish that probable cause exists for the provisional arrest of Ali pursuant to the terms of Article 11 of the Treaty.  Simmons, 627 F.2d at 636 (2d Cir.1980)(The evidence presented by the government in support of a finding of probable cause need not comply with the Federal Rules of Criminal Procedure or the Federal Rules of Evidence, and thus hearsay evidence and unsworn statements are admissible); United States v. Samuels, 2009 WL 367578 (E.D.N.Y.,2009)(same); In the Matter of the Extradition of Ben-Dak, 2008 WL 1307816, at *4 (S.D.N.Y. Apr. 11, 2008)(same).

The evidence in the instant matter includes documents from the Canadian Minister of Justice referencing reports provided by witnesses to the incident underlying the charges against Ali, including the Statement of Stewert (who was previously acquainted with Ali) to the effect that Ali and Babalkher were involved in the altercation with O'Neill and that Ali was sitting in the right side of the rear seat; corroborating the statement made by O'Neill to the Canadian authorities to the effect that he was shot by the person in the right side of the rear seat of the vehicle. That information, together with the other information, including but not limited to, the proffered accounts of the events of April 14, 2011 as provided by Stewert, O'Neill and Whealy, is sufficient to establish probable cause that a crime was committed and that Ali committed the crimes charged by the Canadian authorities. The explanations proffered by Ali, that no one states that they actually saw him shoot O'Neill; that no gun was recovered; and that he had previously lived in Quebec (which is proximate to Burke, New York) do not negate a finding of probable cause.

Having found that probable cause exists for the provisional arrest of Ali, the defendant is held pending a formal request for extradition to be made by the Canadian government pursuant to the treaty.

So Ordered.

                                                                                /s/ Hugh B. Scott  
                                                              United States Magistrate Judge  
                                                              Western District of New York

Buffalo, New York  
August 8, 2011